# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-20171

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

JOSEPH S. ANTONUCCI,

Defendant–Appellant.

United States Court of Appeals
Fifth Circuit

**FILED**

June 22, 2016

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:14-CR-18-1

Before WIENER, PRADO, and OWEN, Circuit Judges.

PER CURIAM:*

Defendant–Appellant Joseph Antonucci pleaded guilty, without a plea agreement, to all counts of a 21-count indictment. The indictment charged him with embezzling money from his employer, Patriot Managed Care Solutions, Inc. ("Patriot"). He appeals his sentence, restitution order, and personal money judgment, arguing that the district court erred when it calculated Patriot's loss by including legitimate business expenses that he incurred on behalf of Patriot.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 15-20171

We VACATE Antonucci's sentence, restitution order, and personal money judgment, and REMAND for resentencing.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Antonucci served as the executive vice president and treasurer of Patriot, a Houston-based company that provided information technology support to healthcare businesses. According to the Presentence Report ("PSR"), he ran Patriot's daily operations. His job duties included "servicing existing customers, obtaining new customers, monitoring the company's financial status, and supervising other Patriot employees."

As charged in the indictment to which Antonucci pleaded guilty, from approximately January 2007 through September 2012, Antonucci defrauded Patriot "by making unauthorized transfers and withdrawals of Patriot funds and directing the money to his own purposes." He embezzled these funds in several ways, including by using Patriot's debit card to pay for personal expenses, writing checks to himself that drew from Patriot's accounts, and wiring funds from Patriot's accounts to his personal account. To conceal his fraud, Antonucci created "false financial documents [that] misrepresented key Patriot accounting figures" and "overstated the company's net worth."

In January 2014, Antonucci was charged in a 21-count indictment. The indictment alleged 15 counts of wire fraud in violation of 18 U.S.C. § 1343, five counts of engaging in financial transactions involving proceeds of unlawful activity in violation of 18 U.S.C. § 1957, and one count of making materially false statements to a federal agent in violation of 18 U.S.C. § 1001. In October 2014, Antonucci pleaded guilty to all counts without a written plea agreement. However, at the time of his plea, Antonucci did not admit to a specific loss amount, and instead, the parties informed the district court that they would "argue about that fact at sentencing."

No. 15-20171

According to the PSR, Antonucci was responsible for a loss of $2,918,261.38. The PSR indicated that this amount equaled the total funds that Antonucci had withdrawn from Patriot and used for his own purposes between 2007 and 2012. Based on this figure, the PSR recommended an 18-level increase to Antonucci's offense-level total pursuant to U.S.S.G. § 2B1.1(b)(1)(J), which applied to loss over $2,500,000 under the then-applicable U.S. Sentencing Guidelines (the "Guidelines"). *See* U.S.S.G. § 2B1.1(b)(1)(J) (2014). After factoring in other adjustments, the PSR concluded that Antonucci's Guidelines range for imprisonment was 51 to 63 months. The PSR also recommended that Antonucci pay restitution in the amount of $2,918,261.38 under the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A(c).

On March 4, 2015, Antonucci filed his objections to the PSR, disputing its loss estimation. He asserted that because handling clients was one of his responsibilities, "travel, entertainment, and dining expenses were routine parts of the job." The PSR, according to Antonucci, provided insufficient evidence to show that particular payments were for personal expenses as opposed to business-related ones. He elaborated that when he contacted the probation office seeking clarification regarding the PSR's loss total, the probation officer said that "she had relied entirely on charts provided by the government." Antonucci acknowledged that the Government had provided "a 54-page chart of Patriot expenses it ascribe[d] to [his] fraud" but argued that the chart provided "almost no description or explanation as to why the individual charges are deemed fraudulent." Antonucci cited seven transactions on the chart's first page that he claimed were examples of business expenses that the Government had not proven were losses. For instance, he cited a $63.85 payment to G7 Productivity System, a software, ink, and paper supplier, and two payments made in Minnesota for $26.82 and $33.04 that

3

occurred around the time that Antonucci had sought to meet with a prospective client in that area.

The Government filed its response on March 30, 2015, the day before sentencing. It argued that all payments made with Patriot's debit card, which included the Minnesota transactions and the G7 Productivity System expense, caused a loss to Patriot because Patriot had a policy that prohibited employees from using its corporate debit card to pay for expenses directly. Patriot instead required employees to seek reimbursement after paying for expenses out-of-pocket.

At sentencing, Antonucci's counsel reasserted his objection that the Government had not carried its burden to prove $2.9 million in loss, although he conceded that there was "clearly [a] loss." When the district court asked if there was an amount to which Antonucci would admit, Antonucci's counsel responded that he had "no doubt" that the Government could prove loss for "the expenses and . . . gambling in Vegas," which he said could be $700,000 to $800,000.[1] He also stated that it was not until "last night" that the Government disclosed that the loss estimation was based in part on Patriot's policy that prohibited employees from using its debit card to pay for business expenses.

The Government responded that it was willing to have FBI financial analyst Roxanne Sebring testify about how she prepared the 54-page chart, which provided the loss figure of $2,918,261.38 that the probation office used in preparing the PSR. The district court asked Antonucci's counsel how he wanted to proceed. After a recess, his counsel requested "an opportunity to respond in writing" to the 54-page chart. The Government objected. It argued that any filing by Antonucci would be unable to "undercut particular line

---

[1] The PSR indicated that Antonucci had caused $691,340.36 in loss to pay for gambling.

items" because Patriot's owner, Joe Schuchert, would testify that "corporate expenses weren't supposed to be charged using a debit card" because Patriot required employees to charge "expenses to their own cards, and then submit an expense report."[2]

The district court granted the Government's request to have Sebring testify about how she created the 54-page chart. Sebring said that she reviewed records from Patriot's and Antonucci's bank accounts, American Express, and Schuchert. The chart, according to her, reflected "all of the charges that Mr. Antonucci used that debit card to, in essence, live off of . . . us[ing] the proceeds from the monies that were received from the clients."

On cross examination, Antonucci's counsel asked Sebring about her methodology for calculating loss. In response to counsel's questioning, she agreed that it was her understanding that any expense made with Patriot's debit card was a loss and "the mere fact" that Antonucci had used a debit card "is what initiated much of these [transactions] to be on this chart." When asked about the two charges made in Minnesota, Sebring agreed that she considered those expenses losses because of "the process by which [Antonucci] incurred the charge," namely, that he used Patriot's debit card.

Antonucci's counsel then objected to Sebring's loss methodology. He argued that whether Antonucci followed Patriot's debit-card policy was a "separate question" from whether he caused a loss to Patriot as a result. The district court overruled his objection, holding that the Government had met its burden that the amounts "as to which testimony was adduced are . . . loss." It imposed a sentence of 60 months' imprisonment for each count to run concurrently and ordered restitution in the amount of $2,918,261.38. It also

---

[2] The Government also noted that the 54-page chart had been available to Antonucci for approximately a year.

entered a personal money judgment in favor of the United States in the amount of $2,895,830.16, which equaled Patriot's "full loss amount" less the $22,431.22 that had already been administratively forfeited.

## II. STANDARD OF REVIEW

The amount of loss resulting from fraud increases the base offense level under the Guidelines. U.S.S.G. § 2B1.1(b)(1). "[L]oss is the greater of actual loss or intended loss." *Id.* cmt. n.3(A). As relevant here, actual loss is the "reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* cmt. n.3(A)(i). The district court's finding as to the loss amount is a question of fact we review for clear error. *United States v. Klein*, 543 F.3d 206, 213–14 (5th Cir. 2008). However, we review de novo "how the court calculated the loss, because that is an application of the guidelines, which is a question of law." *Id.* at 214. "In fact, before assessing the court's loss estimate, we 'first determine whether the trial court's method of calculating the amount of loss was legally acceptable.'" *Id.* (alteration omitted) (quoting *United States v. Olis*, 429 F.3d 540, 545 (5th Cir. 2005)).

"The MVRA authorizes restitution to a victim 'directly and proximately harmed' by a defendant's offense of conviction." *United States v. Sharma*, 703 F.3d 318, 322 (5th Cir. 2012) (quoting 18 U.S.C. § 3663A(a)(2)). "We review the legality of restitution awards *de novo*, and if the award is legally permitted, we review the amount for abuse of discretion." *Klein*, 543 F.3d at 215 (quoting *United States v. Mann*, 493 F.3d 484, 498 (5th Cir. 2007)). Under the MVRA, restitution is limited to the victim's actual loss. *Sharma*, 703 F.3d at 322. Further, "excessive restitution awards cannot be excused by harmless error; every dollar must be supported by record evidence." *Id.* at 323.

## III. DISCUSSION

On appeal, the Government concedes that the loss amount contained in the PSR and adopted by the district court is erroneous. Specifically, it

acknowledges that FBI financial analyst Sebring incorrectly characterized several transactions totaling $70,900 as actual loss when those transactions in fact may have represented amounts that Antonucci deposited into Patriot's accounts. It also concedes that we must vacate the restitution order and remand to allow the district court to determine whether that $70,900 amounts to actual loss.

Thus, the only question is the scope of our remand. According to the Government, we should limit our remand solely to resolve whether the $70,900 in charges constituted actual loss for purposes of Antonucci's restitution order. The record, it claims, is sufficient to support holding that all other transactions contained in the 54-page chart represented Antonucci's use of Patriot funds for his own purposes that caused actual loss to Patriot. Antonucci responds that the Government's loss calculation was defective in other ways. In particular, he claims the chart overstated the loss amount because it included payments made with Patriot's debit card that were deemed losses simply because they were "procedurally improper" but without regard to whether they caused pecuniary harm. He argues we must vacate the sentence in its entirety because this error affects his term of imprisonment, restitution order, and personal money judgment.

Based on the record before us, we cannot agree with the Government that its only error was its inclusion of those payments totaling $70,900. FBI financial analyst Sebring admitted at sentencing that she included debit-card payments as losses solely because they were made in violation of Patriot's policy that employees must personally pay expenses and then seek reimbursement. By implication, she did not consider whether such payments were for Antonucci's personal expenses—and thus caused Patriot an actual loss—or were for legitimate business expenses that he incurred on behalf of

7

No. 15-20171

Patriot.[3] Therefore, because Sebring did not account for whether such payments caused Patriot actual loss, Sebring used an impermissible methodology to calculate the total loss. *See id.* at 322.

Further, the Government has changed the position it took at sentencing with respect to Patriot's debit-card policy. It no longer contends that the debit-card payments that violated Patriot's policy automatically caused an actual loss. Instead, on appeal, it argues that the PSR overcame any flaw in Sebring's loss methodology. According to the Government, the PSR independently concluded the figure of $2,918,261.38 accounted for funds that Antonucci used for his own purposes, and the district court accepted this finding. We find this argument unpersuasive given the record. The PSR's loss estimation matches exactly Sebring's loss calculation of $2,918,261.36. The district court adopted this figure in full. Notably, the Government concedes that the 54-page chart was the "evidentiary support underlying the [PSR's] loss calculation." As such, we must conclude that by accepting Sebring's loss estimation *in toto*, the district court and PSR also adopted her impermissible loss methodology.

Accordingly, the loss methodology applied here—which we review de novo—was erroneous. *See Klein*, 543 F.3d at 214 (finding error where the district court adopted the PSR, which had accepted an investigator's flawed loss calculation). This methodology formed the basis for the restitution order,

---

[3] The fault in Sebring's loss methodology is reflected by specific charges. For example, there is a debit-card charge to "Judy Diamond Associate[s]," which totaled $560. When Antonucci's counsel asked Sebring about this charge at sentencing, she said that she "assume[d] it's a purchase at a jewelry store." However, on appeal, Antonucci points out that this company is not a jewelry store but rather sells employee benefit and retirement plans.

the Guidelines loss estimation,[4] and the personal money judgment assessment. Consequently, we vacate entirely the restitution order, term of imprisonment, and personal money judgment. *See id.* at 215–16.

We offer two points of clarification for remand. First, we do not hold that the Government is precluded from introducing evidence to prove a loss amount equal to the amount contained in the PSR. Rather, we hold only that the loss methodology as articulated by Sebring was impermissible insofar as Sebring did not measure actual loss based only on the pecuniary harm suffered by Patriot.

Second, the Government argues that although it usually bears the burden to prove the victim's loss, the protracted nature of Antonucci's fraud justifies shifting the burden to Antonucci to prove what amounts, if any, constitute legitimate business expenses that did not cause an actual loss. *See United States v. Mahmood,* 820 F.3d 177, 196 (5th Cir. 2016) (citing 18 U.S.C. § 3664(e)) (noting that although "the MVRA places the burden on the Government to prove a victim's actual loss," the district court "may shift that burden to the defendant as justice requires"); *United States v. St. John*, 625 F. App'x 661, 668 (5th Cir. 2015) (per curiam) (observing that the burden-shifting approach may be applied to proving loss under the Guidelines), *cert. denied,* 136 S. Ct. 911, *and cert. denied,* 136 S. Ct. 912 (2016). However, we do not resolve this issue. Instead, we leave it to the district court on remand to decide

---

[4] We review for harmlessness any error in calculating loss for the purpose of determining the defendant's Guidelines range. *United States v. Harris*, No. 15-50106, 2016 WL 1720046, at *16 (5th Cir. Apr. 28, 2016). In this case, the Government has not carried its "heavy burden" to prove harmlessness. *Id.* (quoting *United States v. Ibarra–Luna*, 628 F.3d 712, 717 (5th Cir. 2010)). In its brief, it does not explain why erroneously calculating certain losses based solely on Antonucci's violations of Patriot's debit-card policy was harmless. Rather, it simply argues there was no such error. Further, we cannot conclude the error was harmless given the Government's emphasis at sentencing that such violations were integral to the PSR's loss estimation.

No. 15-20171

in the first instance whether a burden-shifting approach is warranted. *See United States v. De Leon*, 728 F.3d 500, 509 (5th Cir. 2013).

## IV. CONCLUSION

For the foregoing reasons, we VACATE Antonucci's sentence, restitution order, and personal money judgment and REMAND for resentencing consistent with this opinion.